CONTINENTAL AIRLINES, INC., Plaintiff-Appellant,

v.

GOODYEAR TIRE & RUBBER COMPANY, B.F. Goodrich Co., Cleveland Pneumatic, Inc. and Air Treads, Inc., Defendants-Appellees.

McDONNELL DOUGLAS CORPORATION, Plaintiff-Appellee

v.

CONTINENTAL AIRLINES, INC., Defendant-Appellant,

and

Goodyear Tire & Rubber Company, Cleveland Pneumatic, Inc., Sargent Industries, Inc., Defendants-Appellee

Nos. 85–6367, 85–6414, 86–6047 and 86–6195.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 5, 1987.

Submitted April 14, 1987.

Decided June 23, 1987.

1520

Thomas C. Walsh, Joseph E. Gregorich, Robert W. King, Los Angeles, Cal., Darrell A. Forgey, San Diego, Cal., for defendants-appellees.

Before SNEED, FARRIS and NOONAN, Circuit Judges.

SNEED, Circuit Judge:

These cases arise in the aftermath of a serious accident involving a Continental Airlines DC–10 aircraft. We must decide, among other issues, whether an exculpatory clause in the contract of sale between Continental and the aircraft's manufacturer, McDonnell Douglas Corporation (MDC), bars certain of Continental's claims not only against MDC but also against various suppliers of the aircraft's component parts. The district court so held on summary judgment. We find, however, that material issues of fact pertaining to the component part companies' liability remain unresolved. We therefore affirm in part and reverse in part.

## I.

### FACTS

In 1970, Continental agreed to buy a number of DC–10 airplanes from MDC. Their contract included a limited warranty in which MDC undertook certain servicing obligations and an exculpatory clause in which Continental waived "all other remedies" against MDC. The exact text of these provisions is discussed below.

On March 1, 1978, one of these DC–10s was nearing takeoff at Los Angeles International Airport when the two front tires of its left-side landing gear blew out. The pilot aborted the takeoff, but the uncushioned landing gear tore through the tarmac and broke away from the plane. In doing so it ruptured the left wing's fuel tank, which burst into flame. The emergency escape slides failed, apparently due to the heat of the ensuing fire. Some passengers evacuated through the copilot's window;

Gregory A. Long, Los Angeles, Cal., for plaintiff-appellant.

others jumped from the exits. Four died, and over seventy suffered injuries. The plane was destroyed.

## II.

## PROCEEDINGS

In December of 1979, Continental filed two suits, one state and one federal. In state court, Continental sued MDC and Sargent Industries, supplier of the escape slides. In federal court, Continental sued Goodyear and B.F. Goodrich, each of which had supplied one of the two blown-out tires. Continental later filed a second federal action against Air Treads, which had retreaded the Goodyear tire. In each suit, Continental sought damages for the lost airplane and indemnity against liability to passengers.

MDC sought a federal forum. It tried initially to remove the state case, but the district judge, after finding no federal question and no diversity because Sargent and Continental were both California citizens, remanded the case to the state court. MDC then instituted a federal declaratory judgment action. It named Continental, Sargent, Goodyear and Goodrich as defendants, basing jurisdiction on diversity. At Continental's request, all three federal actions were consolidated. Proceedings in Continental's remanded case continued independently in state court.

In early 1985, MDC sought summary judgment in its federal action. At the same time, Continental moved to dismiss or stay MDC's federal action in favor of the state litigation. The district court denied Continental's motion and granted partial summary judgment in favor of MDC. It held that MDC's exculpatory clause was enforceable under California law and effective against Continental's negligence and strict liability claims as to loss of the aircraft. The judgment did not reach Continental's fraud or breach-of-warranty theories of recovery, or its passenger indemnification claims. In September, 1985, the district court also granted partial summary judgment to the parts manufacturers on the basis of its holding that MDC's exculpatory clause also barred any action against them for damage to the airplane. Once again the issue of passenger indemnity was left open. On a motion by MDC and the parts manufacturers shortly before the state trial was to begin, the district court certified these partial summary judgments as final for appeal under Fed.R. Civ.P. 54(b).

The state court correctly held that these judgments, because certified as final, were res judicata for purposes of the state jury trial. Nevertheless, Continental pursued and prevailed on its fraud/breach-of-warranty claims for damage to the aircraft. That judgment is on appeal in the higher California courts. During the trial, moreover, the parties settled all the passenger indemnification claims. Only the loss of the airplane—worth some $30 million—remains at issue.

## III.

## ISSUES

Continental appeals the partial summary judgments on various jurisdictional and substantive grounds. Our discussion will proceed as follows. First we consider whether complete diversity existed below; whether the district court should have abstained; and whether the 54(b) certification was proper. Turning to the merits, we then address whether the exculpatory clause is enforceable in favor of MDC to the extent that the district court ruled, and finally whether it is enforceable to the same extent in favor of the tire companies.

## IV.

## DIVERSITY JURISDICTION OVER MDC'S DECLARATORY JUDGMENT ACTION

As noted above, when MDC attempted to remove Continental's state case, the district court correctly remanded for lack of diversity. Yet MDC then brought essentially the same action before the same district court in the form of a declaratory judgment suit, premising jurisdiction on diversity. The parties did not raise this ap-

parent jurisdictional defect, but we are obliged to consider it sua sponte.

MDC's federal complaint pleaded Continental, Sargent, Goodyear, and Goodrich as defendants. With the parties thus aligned, there was complete diversity. But as this circuit has stated:

> The courts, not the parties, are responsible for aligning the parties according to their interests in the litigation. If the interests of a party named as a defendant coincide with those of the plaintiff in relation to the purpose of the lawsuit, the named defendant must be realigned as a plaintiff for jurisdictional purposes.

*Dolch v. United Cal. Bank,* 702 F.2d 178, 181 (9th Cir.1983) (citations omitted) (realigning party and vacating for lack of jurisdiction). The critical question here is Sargent's proper alignment; as we have said, Continental and Sargent were both California citizens.[1] Sargent's alignment with MDC would destroy complete diversity.

Sargent, properly aligned, does belong with MDC. Sargent's strongest contention below was that MDC's exculpatory clause

barred Continental's claims against the parts manufacturers. Indeed, the district court so held. MDC took the same position because if Continental had been able to recover against Sargent, Sargent could have sought indemnity against MDC. Thus both manufacturers had an identical interest in proving the validity and scope of -MDC's exculpatory clause. Indeed Sargent filed papers below supporting MDC's winning summary judgment motion, and the two parties arranged to be represented by the same counsel on this appeal.

Thus, with respect to the primary matter in dispute, *see Indianapolis v. Chase Nat'l Bank,* 314 U.S. 63, 69, 62 S.Ct. 15, 16, 86 L.Ed. 47 (1941), Sargent was in reality MDC's co-party against Continental.[2] Diversity in MDC's action was therefore lacking. This does not, however, render MDC's judgment void. Despite earlier case law to the contrary, it is now settled in this circuit that practicality prevails over logic and that we may dismiss a dispensable, non-diverse party in order to perfect retroactively the district court's original jurisdiction.[3]

---

1. Continental is no longer a California citizen. Diversity jurisdiction, however, "depends upon the state of the parties at the commencement of the suit." *Connolly v. Taylor,* 27 U.S. (2 Pet.) 556, 565, 7 L.Ed. 518 (1829) (Marshall, C.J.). Sargent's alignment, it should be noted, affects jurisdiction only in MDC's suit. In Continental's suits against the tire companies, diversity is unproblematic. Sargent was not a party to these suits, and the consolidation of cases below did not "make those who are parties in one suit parties in another." *Johnson v. Manhattan Ry.,* 289 U.S. 479, 497, 53 S.Ct. 721, 728, 77 L.Ed. 1331 (1933).

2. Certainly MDC and Sargent would have disputed their respective liability to Continental, had any been found. But the inquiry goes to the "principal purpose of the suit," or the "primary and controlling matter in dispute." *Indianapolis,* 314 U.S. at 69, 62 S.Ct. at 16 (quoting prior cases). And the "principal purpose" of MDC's federal suit was, in that party's own words, to obtain a "declaration that the exculpatory clause precluded *all* of Continental's claims arising out of the accident, whether pursued directly against MDC or indirectly through other alleged joint tortfeasors." Brief of MDC, at 5 (original emphasis). Alternatively, because MDC's suit was declaratory, we can look to the underlying cause of action and see its principal purpose as Continental's claim against all the appellees. From both perspectives, the manu-

facturers' internal dispute over contribution was ancillary to the essential controversy. *See Eikel v. States Marine Lines,* 473 F.2d 959, 964–65 (5th Cir.1973).

The Seventh Circuit has apparently rejected the "principal purpose" test. *See, e.g., Fidelity & Deposit Co. v. City of Sheboygan Falls,* 713 F.2d 1261, 1267–68 (7th Cir.1983) (alignment as pleaded will stand if there is any "substantial" dispute between parties). We, however, consider *Indianapolis* to require this test, *see* 314 U.S. at 69, 62 S.Ct. at 16, and in any event are bound by our opinion in *Dolch, see* 702 F.2d at 181 (looking to the "purpose of the lawsuit").

3. *E.g., Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1422 n. 1 (9th Cir.1986); *Ross v. International Bhd. of Elec. Workers,* 634 F.2d 453, 456 (9th Cir.1980); *Fidelity & Casualty Co. v. Reserve Ins. Co.,* 596 F.2d 914, 918 (9th Cir.1979); *see also Reed v. Robilio,* 376 F.2d 392, 394 (6th Cir.1967) (non-diverse but originally indispensable party may be dismissed if party becomes dispensable pending appeal). *Contra, e.g., Dollar S.S. Lines v. Merz,* 68 F.2d 594, 597 (9th Cir.1934). The *Dollar* line of cases has apparently been overruled sub silentio. Conferring jurisdiction retroactively is a curious idea. Knowledgeable judges have said it cannot be done. *E.g., Denberg v. United States R.R. Retirement Bd.,* 696 F.2d 1193, 1197 (7th Cir.1983) (Posner, J.), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d

Sargent is dispensable because the only claims to which it was party involved passengers' injuries, and these claims have all been settled. Indeed in its brief Sargent explicitly disclaims any further interest in this litigation. We therefore dismiss it now under Fed.R.Civ.P. 21.

## V.

### DISMISSAL OR STAY OF FEDERAL PROCEEDINGS

■ Continental insists that the district court abused its discretion by failing to dismiss or stay the federal proceedings in favor of the state litigation commenced earlier. We disagree.

If there were before us only MDC's declaratory judgment action, Continental would have a stronger claim. Federal courts are ordinarily said to have special jurisdictional discretion in such actions in order to prevent parties from using the Declaratory Judgment Act—as MDC has clearly done here—to circumvent the removal statute or to create a race to judgment. *See Transamerica Occidental Life Ins. Co. v. DiGregorio,* 811 F.2d 1249, 1253 (9th Cir.1987). MDC's action, however, is not the only one before us. Continental's two federal actions are also before us, and they are not declaratory in nature.

With MDC's declaratory suit, the district court consolidated—at Continental's own motion—the airline's suits against the tire companies. These were ordinary coercive suits, as to which Continental never requested abstention. *See* Excerpt of Record (E.R.) vol. 36, tab "288 of 1" (motion to stay or dismiss directed only to *MDC's* complaint). Because the district court's resolution of those suits necessarily involved an adjudication of the validity and scope of MDC's exculpatory clause—the very relief that MDC prayed for—it would have served no purpose to abstain in the declaratory action.

We would confront a different situation had Continental initially sought abstention instead of consolidation in response to the MDC's declaratory action. But in the actu-

180 (1984). They underestimated, it appears,

al circumstances, by 1985, the district court had no choice but to proceed with the claims against the tire companies, and no reason not to proceed with MDC's declaratory claims as well.

## VI.

### PROPRIETY OF THE RULE 54(b) CERTIFICATIONS

Continental next challenges appellate jurisdiction, on the ground that the Rule 54(b) certification of the judgments was an abuse of discretion. It contends the requirements of Rule 54(b) were not met and that the purpose of the certifications, to generate a res judicata effect, was improper. These arguments are not entirely without merit, but we hold that the district court remained within its discretion.

### A. *Requirements of Rule 54(b).*

■ In pertinent part, Rule 54 requires a certifiable judgment finally to resolve at least one claim in a multiple-claim action or finally to adjudicate the position of at least one party to a multiple-party action. *See* Fed.R.Civ.P. 54(b). That is, claims must be multiple and at least one must have been adjudicated finally. *See Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 743, 96 S.Ct. 1202, 1206, 47 L.Ed.2d 435 (1976). Continental submits that the instant judgments fulfilled neither condition.

The partial summary judgments at issue here had the following effects: they held the exculpatory clause enforceable; they barred recovery by Continental for aircraft damage from all the parts manufacturers; and they also barred such recovery from MDC on any negligence or strict liability theory. These judgments did *not* affect Continental's potential recovery against any appellee for passenger indemnification, nor resolve Continental's fraud and breach-of-warranty theories against MDC for loss of the airplane.

While we confidently hold that multiple claims existed in this case, we cannot be equally certain that any one of them was

judicial—or at least appellate—resolve.

finally adjudicated below. Distinguishing "claims" from theories of recovery for purposes of Rule 54(b) has occasioned a good deal of subtle jurisprudence. A claim, it is true, is less than the central object of a lawsuit and surely more than merely one element of proof offered in support of a complaint seeking money damages. But the essence eludes the grasp like quicksilver. We agree with Judge Wisdom that the solution for Rule 54(b) purposes lies in a more pragmatic approach focusing on severability and efficient judicial administration. *See Local P–171, Amalgamated Meat Cutters v. Thompson Farms Co.*, 642 F.2d 1065, 1070–71 (7th Cir.1981) (Wisdom, J., sitting by designation); *see also Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980) (emphasizing prevention of piecemeal appeals); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 54.33[2], at 54–194 (2d ed. 1987) (appellate decisions since *Curtiss-Wright* have adopted a more pragmatic approach). With these considerations in mind, we conclude that the requirements of Rule 54(b) were satisfied here.

It is true that the partial summary judgments below eliminated none of the parties and left open potentially full recovery in both of Continental's ultimate areas of loss (damage to the airplane and liability to passengers). For that reason, it is possible that Continental might never have needed to appeal the instant judgments if the case had been compelled to go forward. Rule 54(b) certification is ordinarily disfavored in such circumstances.

Nonetheless, given the size and complexity of this case, we cannot condemn the district court's effort to carve out threshold claims and thus streamline further litigation. In these partial summary judgments, the district court effectively narrowed the issues, shortened any subsequent trial by months, and efficiently separated the legal from the factual questions. The matters disposed of by the partial summary judgments were sufficiently severable factually and legally from the remaining matters, and they completely extinguished the liability of the tire companies as to the airplane damage claim. We hold that Rule 54(b) certification was proper under the circumstances of this case.

### B. *The Res Judicata Purpose.*

█ This case raises the question, which we believe is novel in this circuit, of whether a 54(b) certification may be awarded for the purpose of producing res judicata effects elsewhere. At least two circuits have suggested it may. *See Bank of Lincolnwood v. Federal Leasing, Inc.*, 622 F.2d 944, 950 n. 7 (7th Cir.1980) (dictum) ("no just reason for delay" means not only delay of appeal but delay of res judicata); *Republic of China v. American Express Co.*, 190 F.2d 334, 339 (2d Cir.1951) (Frank, J.) (indicating that the district court *should* have made a 54(b) certification to assure res judicata). Continental would have us hold that a judgment's res judicata effect is an improper consideration in determining whether to certify it for appeal under Rule 54(b). This we decline to do. Because a 54(b) ruling in fact has res judicata ramifications, which are potentially very important, it would be unsound and ineffectual to hold that the district courts may not consider this factor in deciding for or against certification.

We do not wish to encourage the district courts to use their 54(b) powers to promote a race to judgment or to "snatch from the state courts" a dispute being properly litigated there. *Geni-Chlor Int'l. Inc. v. Multisonics Dev. Corp.*, 580 F.2d 981, 985 (9th Cir.1978). But we would be reluctant to adopt a rule that, in the circumstance of complex parallel state and federal litigation, the district court must either become inactive or incur the risk of wasting its efforts. We hold that an otherwise permissible 54(b) certification designed to produce res judicata effects in another forum was proper under these circumstances.

### VII.

### THE MERITS

### A. *The Limited Warranty and Exculpatory Clause.*

Article 12 of the MDC/Continental contract sets forth MDC's limited warranty,

servicing obligations, and exculpatory clause. For two years after delivery, MDC warranted the quality of, and agreed to repair defects in, all:

> parts of the aircraft delivered hereunder which have been manufactured by [MDC] and by other manufacturers if made to detailed design and detailed specifications originated by [MDC].

E.R. vol. 35, tab "230 of 1," p. 24. In addition, MDC agreed to service fleetwide defects that might develop within ten years after delivery. *Id.* at 33–34. In block capital lettering, Part III of Article 12 provides as follows:

> The warranty and service life policy provided in this article and the obligations and liabilities of seller under said warranty and service life policy are exclusive and in lieu of, and buyer waives, all other remedies, warranties, guarantees or liabilities, express or implied, with respect to each aircraft, product and article delivered hereunder, arising by law or otherwise (including without limitation any obligation or liability of the seller arising from negligence or with respect to fitness, merchantability, loss of use, revenue or profit or consequential damages).

*Id.* at 39.

### B. *Is the Exculpatory Clause Vitiated by Fraud in the Inducement?*

Continental claims that MDC made certain fraudulent misrepresentations in negotiating the contract. Indeed Continental appears to have prevailed on its fraud claim in the state jury trial. The airline contends that MDC's fraud should vitiate the exculpatory clause. The district court ruled to the contrary, and we affirm its reasoning.

■ A defrauded party to a contract may, in California, rescind his contract, seek consequential damages for fraud, or both. *Star Pac. Invs., Inc. v. Oro Hills Ranch, Inc.,* 121 Cal.App.3d 447, 461, 176 Cal.Rptr. 546, 554 (1981); Cal.Civ.Code § 1692. Thus Continental, if the victim of

fraud, could have demanded not only the consequential damages resulting from the fraud, but also full restitution of its original payment to MDC. To obtain the latter remedy, however, Continental would have had to restore to MDC all the consideration it had received under the contract, and to have treated the contract as void in its entirety.

In 1978, when the accident occurred, Continental still had valuable warranty rights under the original contract. Continental did not seek a restitutionary remedy, nor attempt to void the entire contract. Continental cannot *partially* rescind a non-severable contract. "[I]t is axiomatic that ... the entitled party must rescind the entire contract and may not retain the rights under it which he deems desirable and repudiate the remainder." *Yeng Sue Chow v. Levi Strauss & Co.,* 49 Cal.App.3d 315, 326, 122 Cal.Rptr. 816, 822 (1975). The district court viewed Continental's attempt to escape the exculpatory clause without voiding the entire contract as a form of partial rescission. This was a plausible characterization.

### C. *Did Continental Waive Its Adhesion and Unconscionability Arguments?*

■ In early 1985 the district court ruled that Continental could not argue that the exculpatory clause was unconscionable because the pre-trial order of December, 1984, did not include that issue. Continental contends that the pre-trial order did encompass the issue. We hold that the error, if error there be, is harmless.

A pre-trial order is controlling unless modified. Fed.R.Civ.P. 16(e). The order is, nonetheless, to be "liberally construed to permit any issues at trial that are 'embraced within its language.'" *Miller v. Safeco Title Ins. Co.,* 758 F.2d 364, 368 (9th Cir.1985) (quoting *United States v. First Nat'l Bank,* 652 F.2d 882, 886 (9th Cir.1981)). The order here, liberally construed, very likely did frame the unconscionability argument.[4]

---

4. Review here of the 75–page pretrial order would be pointless. Suffice it to note that the order included the issue, "Whether the Exculpa-

tory Clause is against public policy and the policy of the law and is void." E.R. vol. 31, tab "277 of 1," p. 56. Under California law, uncon-

Nevertheless, any error was harmless. The doctrine of unconscionability cannot be invoked by so sophisticated a party as Continental in reference to a contract so laboriously negotiated. *See Geldermann & Co. v. Lane Processing, Inc.,* 527 F.2d 571, 576 (8th Cir.1975) (unconscionability doctrine unavailable to sophisticated investor), *cited for this proposition in Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 927, 216 Cal. Rptr. 345, 355, 702 P.2d 503, 513 (1985), *appeal dismissed,* —— U.S. ——, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986); *AMF Inc. v. Computer Automation, Inc.,* 573 F.Supp. 924, 930 (S.D.Ohio 1983) (applying California law) (unconscionability doctrine held inapplicable on summary judgment to contract between "large, sophisticated merchants"). We affirm the district court's rejection of the unconscionability argument on the basis of doctrine. We do not rely on waiver.

### D. *Does the Exculpatory Clause Exempt MDC from Liability for Violations of Law?*

■ California law prohibits enforcement of contractual provisions that seek to "exempt" a party from "responsibility for his own ... violation of law." Cal.Civ. Code § 1668. Continental submits that the exculpatory clause is therefore unenforceable to the extent that it bars Continental from showing that MDC violated federal aviation regulations, which violations allegedly caused the accident. The district court correctly rejected this claim.

The exculpatory clause does not permit MDC to violate the federal regulations with impunity; it merely bars suit *by Continental* on this ground. Other sanctions remain in place. As we have said in a similar case, "nothing inhibits the operation of the regulation[s] in question through [passengers'] suits ... or sanctions imposed by the Federal Aviation Administration." *S.A. Empresa de Viacao Aerea Rio Grandense v. Boeing Co.,* 641 F.2d 746, 753 (9th Cir.

1981); *see Airlift Int'l, Inc. v. McDonnell Douglas Corp.,* 685 F.2d 267, 269 (9th Cir. 1982) (rejecting the same claim here advanced by Continental).

### E. *Is the Exculpatory Clause Void as Against Public Policy?*

■ Several California cases have invalidated exculpatory clauses when they appear in adhesion contracts deemed to involve the "public interest:" *See, e.g., Tunkl v. Regents of the Univ. of Cal.,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). But California appellate courts have specifically held that an aircraft purchase agreement is not such a contract. *Philippine Airlines, Inc. v. McDonnell Douglas Corp,* 189 Cal.App.3d 234, 240–41, 234 Cal.Rptr. 423, 426–27 (1987); *Delta Air Lines, Inc. v. Douglas Aircraft Co.,* 238 Cal.App.2d 95, 103–04, 47 Cal.Rptr. 518, 523–24 (1965). Moreover, *Tunkl's* approach essentially is rooted in the unconscionability doctrine. *See Graham v. Scissor-Tail, Inc.,* 28 Cal.3d 807, 821 & n. 20, 171 Cal.Rptr. 604, 612–13 & n. 20, 623 P.2d 165, 173–74 & n. 20 (1981). Thus, for the reasons mentioned earlier, it makes little sense in the context of two large, legally sophisticated companies to invoke the *Tunkl* application of the unconscionability doctrine. Nothing in the MDC–Continental contract impairs the rights of injured passengers to recover against either MDC or Continental.

### F. *Does the Exculpatory Clause Bar Claims of Post-delivery Negligence or Strict Liability?*

■ Continental argues that the exculpatory clause does not unambiguously reach claims of post-delivery negligence and strict liability. But we have already held that such clauses do bar strict liability claims, *see Airlift,* 685 F.2d at 269, and post-delivery negligence claims, *Empresa,* 641 F.2d at 750. Indeed in *Empresa,* we

---

scionability is a species of voidness for public policy. *See, e.g., Drennan v. Security Pac. Nat'l Bank,* 28 Cal.3d 764, 775 n. 14, 170 Cal.Rptr. 904, 910 n. 14, 621 P.2d 1318, 1324 n. 14 ("[E]ven a term clearly stated may be unen-

forceable if it is so unconscionable that its enforcement would be contrary to public policy."), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 112 (1981).

emphasized that a general exculpatory clause quite similar to MDC's was sufficiently unambiguous to permit summary judgment on these issues. *Id.* at 750–51.

### G. Does the Exculpatory Clause Bar Continental's Claims Against the Parts Manufacturers?

To this point we have concluded (1) that the district court correctly held MDC's exculpatory clause to be enforceable under California law and (2) that it precluded Continental's negligence and strict liability claims against MDC.[5] We now consider the district court's ruling that the exculpatory clause also completely barred any property damage recovery by Continental against the three tire companies. Here we hold the district judge erred.

The court below relied on *Aeronaves de Mexico, S.A. v. McDonnell Douglas Corp.,* 677 F.2d 771, 773–74 (9th Cir.1982), which held that an MDC exculpatory clause barred an airline's suit against certain parts suppliers, and on *Airlift,* 685 F.2d at 270, which summarily held the same as to a Boeing exculpatory clause "on the authority of *Aeronaves.*" The reasoning in *Aeronaves* proceeded in this fashion. The court pointed out that the airline already had received from MDC over $400,000 worth of free servicing under its warranty provisions. To permit recovery by the airline from the parts suppliers for consequential damages would enable the parts suppliers thereafter to sue MDC for indemnity. The consequence would be that the airline would in effect circumvent the exculpatory clause and reap a "windfall" of free repairs plus consequential damages. 677 F.2d at 773. The crux of the matter, as *Aeronaves* saw it, was that the airline (by way of the exculpatory clause) had waived its consequential damage remedies in return for MDC's promise to provide valuable servicing of the component parts that allegedly caused the accident. The airline should not be permitted 'to have its cake and eat it

too.' The situation in *Airlift* appears to have been the same.

As Continental points out, however, the contractual provisions in this case differ in a significant respect. In *Aeronaves,* "the warranty provisions ... explicitly extend[ed] to components of the aircraft manufactured by entities other than MDC, regardless of who supplied the design specifications." 677 F.2d at 774. Here, however, the warranty provisions reach other manufacturers' parts only if they were "made to detailed design and detailed specifications originated by MDC." *See supra.* If the tire companies did not make their products according to MDC's design specifications, then presumably MDC was under no obligation to service them. If this is true, the potential for a "windfall" that was present in *Aeronaves* would not exist here. Continental would have surrendered no right to recover damages in exchange for rights to servicing. It would be entitled to at least a portion of its cake because it had not previously eaten it.

The tire companies strenuously argue that our precedents establish an inflexible rule according to which MDC's exculpatory clause bars Continental's claims against them regardless of whether MDC's warranty reached their products. We reject this interpretation. According to the tire companies' view of Continental's contract, the airline meant to give itself no protection whatever against defects in those parts that MDC had not either produced or designed. MDC would not guarantee or service these parts, but nonetheless Continental waived all claims against MDC *and the parts manufacturers* with respect to them. Neither *Aeronaves* nor *Airlift* discussed such a possibility, nor do we believe they require such a result.

Thus we hold the *Aeronaves* doctrine should not have been mechanically applied here. On remand, the district court must determine (1) whether the warranty in fact

---

5. Because we uphold MDC's summary judgment on these claims, we need not reach Continental's contention that the district court erroneously denied its motion for a trial by jury against MDC. Although some of Continental's claims against MDC are still pending, these claims are not part of the 54(b) certification. We by no means suggest that the denial of Continental's jury right as to the pending claims was correct.

reached these component parts or (2) whether this question raises issues of fact improper for summary judgment. If the warranty did not reach certain of the component parts here at issue, then Continental may sue the suppliers of those parts.

Nevertheless, Continental's potential recovery may only be partial. MDC's liability continues to be limited by the exculpatory clause. Thus, even should MDC be found jointly and severally liable with a parts manufacturer whose part is not covered by the exculpatory clause, that liability has been contracted away by Continental by means of the exculpatory clause. That clause excluded *all* remedies against MDC other than those provided by the "warranty and service life policy."

Whether MDC's immunity extends far enough to defeat a suit by a non-covered parts manufacturer for contribution or indemnity is not before us. We observe, however, that should it so extend, the non-covered parts manufacturer's liability to Continental in fairness should not exceed that portion of the damage attributable to its portion of the wrong. Reason suggests that MDC should be immune from such contribution or indemnity and that the non-covered tire company's liability to Continental be so limited.[6]

ment in that case is AFFIRMED. The partial summary judgments in favor of Goodrich, Goodyear, and Air Treads are REVERSED and REMANDED for further consideration of whether MDC's warranty provisions covered the parts each supplied.

## VIII.

## CONCLUSION

Sargent is dismissed from MDC's declaratory action, and the partial summary judg-

---

6. This result would also comport with the California Supreme Court's repeated observation that "equity and fairness" demand liability for multiple tortfeasors "in proportion to their relative culpability, rather than the imposition of the entire loss upon one." *American Motorcycle Ass'n v. Superior Court*, 20 Cal.3d 578, 595, 146 Cal.Rptr. 182, 193, 578 P.2d 899, 910 (1978), *quoted in Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal.3d 488, 495, 213 Cal.Rptr. 256, 260, 698 P.2d 159, 163 (1985). The fact that Continental has waived its claim for losses owing to MDC's negligence or strict liability should not increase a parts manufacturer's liability. To the contrary, a parts manufacturer could be seen as a third-party beneficiary of MDC's exculpatory clause insofar as it was relieved of joint and several liability for MDC's portion of the loss. Alternatively, MDC could be seen as having a right to indemnity *from Continental* for any indemnification MDC must make to the parts manufacturers. The result in either case should be the same.

It should be noted that the potential dispute that may arise between MDC and the parts manufacturers does not affect our earlier holding with respect to the alignment of parties below. This potential dispute is secondary to the principal cause of action between Continental on the one hand and all the appellees on the other, in which cause of action all the appellees had substantially identical interests. *See supra* note 2.